# Supreme Court of Florida

FRIDAY, AUGUST 7, 2026

Kevin Emas,
                Petitioner(s)

v.

Ron D. DeSantis, Governor,
                Respondent(s)

**SC2026-0985**

---

Petitioner's "Verified, Time-Sensitive, Non-Routine Petition for Writ of Mandamus" is hereby denied as moot.

COURIEL, C.J., and MUÑIZ, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs with an opinion.
TANENBAUM, J., specially concurs with an opinion.

LABARGA, J., concurring.

I concur in denying the mandamus petition as moot given the Governor's July 10, 2026, appointment to fill the vacancy on the Third District Court of Appeal. Yet, I write to emphasize that under article V, section 11(c) of the Florida Constitution, "[t]he governor *shall* make the appointment within sixty days after the nominations have been certified to the governor." (Emphasis added.)

The Florida Constitution does not provide an exception to this

60-day requirement, which serves to ensure the orderly administration of our courts. In this case, the appointment exceeded the constitutional deadline by more than 50 days.

TANENBAUM, J., specially concurring.

This court has no authority to issue a compulsory writ against the Governor regarding one of his core functions: appointment. To be sure, the Florida Constitution authorizes us to issue writs of mandamus "to state officers and state agencies." Art. V, § 3(b)(8), Fla. Const. This authorization, in one form or another, has been in the State's Constitution since 1956. Yet, over a century-and-a-half span straddling the year this provision was added, we consistently considered the Governor to be no ordinary officer, instead recognizing him as the State's supreme executive—the branch head co-equal in dignity with this court and the Legislature—and reading our Constitution's separation-of-powers provision to preclude this court from issuing mandamus to him.

More recently, the court has taken to just ignoring the century-old gubernatorial immunity principle it consistently had

been applying—namely, entertaining petitions for mandamus writs to the Governor on the merits, without expressly saying it was overruling itself or explaining how the immunity principle suddenly was demonstrably wrong. The principle, of course, is not wrong, and there has been no change to the Constitution's text that could justify this court's abrupt change in course. I will continue to adhere to this long-recognized immunity principle until there has been some meaningful legal justification for discarding it. Applying that principle in this case, I would have dismissed the petition at the very beginning, before ordering a response, for lack of jurisdiction.[1]

---

1. Under our internal operating procedures, a single justice may, in the name of the court, order a response to an extraordinary writ petition. *See* Fla. S. Ct. I.O.P. II.D.2. This is so despite our rule of appellate procedure requiring the petition to "demonstrate[] a preliminary basis for relief" before a court would order a respondent either to "show cause" why the writ should not issue or to otherwise respond to the petition. Fla. R. App. P. 9.100(h).

Whether a petition meets this "preliminary basis" requirement can be a substantive determination. The response under this provision replaces the alternative writ of mandamus that used to issue if the court determined that, taking the asserted facts as true, there was a legal basis for issuing the writ. That alternative writ had judicial force once issued, and its "mandate" was "peculiarly

I

A

The People of Florida demand that their government's

sovereign powers be distinct and separate, and they have included

that mandate in every one of their constitutions, from the 1838

territorial constitution through the current, 1968 revision.  *See* Art.

II, § 3, Fla. Const. (1968); *see also* Art. II, Fla. Territorial Const.

(1838).  For nearly 150 years, we faithfully honored that separation

---

within the control of the court," to be fashioned "to suit the case
made in the petition."  *City of Bradenton v. State ex rel. Perry*, 160
So. 506, 507 (Fla. 1935).

Given that "the alternative writ takes the place of a declaration
at law," it was necessary "that it should show a clear prima facie
case in favor of the relator."  *State v. Richards*, 39 So. 152, 154 (Fla.
1905).  The party to whom the writ was directed in turn had to
comply with the mandate of the alternative writ or submit a return
showing why the party had not.  If the respondent failed to
demonstrate good cause, the court would issue a final judgment
directing issuance of a peremptory writ.  *See generally Merchants'
Broom Co. v. Butler*, 70 So. 383 (Fla. 1915).

When we do not order a response, it is the same as when a
court would refuse issuance of an alternative writ in the first
instance or would discharge it following a demurrer—saying,
essentially, the petition is facially deficient.  This is the case here
because there could be no legal basis for issuing the requested writ
to the Governor regarding his appointment power.

by refusing to issue writs of mandamus to the Governor, reasoning that to issue the writ would be to subordinate the Governor to the court. *See State ex rel. Bisbee v. Drew*, 17 Fla. 67, 70–71 (1879) ("The Executive, Legislative and Judicial Departments of the government are, by express provisions of the Constitution, each entirely independent of the other in their official action."); *id.* at 71 ("It has ever been considered by statesmen and jurists that where one has power over another, in a public capacity, the one is the greater and the other the inferior power."); *id.* at 85 (refusing mandamus to "control the action of the Governor in respect to a political duty of his office").

In *Drew*, the court put in some serious analytical work to support its conclusion. It surveyed decisions from other states' courts on the topic, and it determined that issuing a compulsory writ to the Governor would be akin to subjugating a co-equal branch to the court.

The *Drew* Court went on, correctly, to observe the following:

> To assume that this court or the Circuit Courts may direct what acts he shall perform *as* the Governor of the

State, under the laws of the State, or what acts he shall not perform . . . is to place the office of Governor in a position inferior to that of a judge of a court of record, and to absorb the power of the "Supreme Executive," the "Chief Magistrate, who shall be styled the Governor of Florida."

. . .

If the courts have this power and command him to obey, we must have power also to imprison him for contempt, when he shall see fit to differ with the courts in reference to his duties and neglect to obey a writ which shall command obedience. Have the courts power thus to deprive the State of its head? If we have a case in which we cannot punish the disobedience, it results that we had no power to command; the command is idle and nugatory; we can produce no result except the exposure of our own impotence.

*Id.* at 72–73; *see also id.* at 73 ("To employ the power of the courts in the business of managing the office of Governor and directing him in the exercise of executive duties, is to blot out the character given him in the Constitution of 'Supreme Executive' and 'Chief Magistrate' of the State, and reduce him to the level of a secretary or county clerk.").

In an additional nod toward judicial restraint and respect for the Constitution's separation of powers, the court construed the

Governor's "right" to request a written opinion of this court's justices "as to the interpretation of any portion of this Constitution upon any question affecting his executive powers and duties"—a right that the Constitution still provides to him—"as fixing the boundary . . . beyond which the courts or judges shall not go in the direction of intermeddling with the duties of the Governor of the State." *Id.* at 72–73; *cf.* Art. IV, § 1(c), Fla. Const.

Decades later, we continued to take the same view regarding any duty to be performed by the Governor, regardless of how ministerial it might be—including countersigning payment warrants—categorically stating that the "[j]udiciary is without power to direct or coerce the Governor in the exercise of any administrative function." *State ex rel. Axleroad v. Cone,* 188 So. 93, 93 (Fla. 1939) (once again refusing mandamus and citing *Drew*). Notably, this statement merely reaffirmed what we had said in *Drew*—that the court would make no distinction between ministerial duties that could be performed by any officer and core political functions that only the Governor could perform. *See Drew,*

17 Fla. at 72, 83–84 (explaining that even a ministerial duty "is yet an act of executive authority and power, whether derived from the Constitution or the Statutes," such that the Governor "cannot be commanded by the courts to perform any act which may be required of him by a law of the State relating to the executive office, or any duty which he may be required to perform of a political nature, even though private rights may be involved").

Regardless of the duty, then, this court was not about to subordinate the Governor via issuance of a writ. *Cf. Kirk v. Baker*, 229 So. 2d 250, 252 (Fla. 1969) (observing that the Governor is "cloaked with immunity" from the courts' contempt power because "[i]t is unthinkable that any inferior officer of this state could, in the guise of the exercise of judicial power, thwart the powers of the executive and thereby prevent or interfere with the full, unfettered performance of his official duties").

This court later noted in 1973 that "the rigid rule" against issuing mandamus to the Governor in any instance, announced in *Axleroad* (and even earlier, in *Drew*), had "been greatly eroded by

subsequent decisions and constitutional changes," doing so,

though, without discussing in any detail those purported decisions

or changes. *Willits v. Askew*, 279 So. 2d 1, 3 (Fla. 1973). It did,

however, cite a relatively new provision, added as part of the 1968

Constitution, which stated as follows:

> The treasurer shall keep all state funds and securities.
> He shall disburse state funds only upon the order of the
> comptroller, countersigned by the governor. The
> governor shall countersign *as a ministerial duty subject to
> original mandamus.*

Art. IV, § 4(e), Fla. Const. (1968) (emphasis supplied).

A similar provision in the 1885 Constitution had stated the

following:

> The Treasurer shall receive and keep all funds, bonds,
> and other securities, in such manner as may be
> prescribed by law, and shall disburse no funds, nor issue
> bonds, or other securities, except upon the order of the
> Comptroller *countersigned by the Governor, in such
> manner as shall be prescribed by law.*

Art. IV, § 24, Fla. Const. (1885) (emphasis supplied). So the 1968

revision clearly and specifically repudiated the principle announced

in *Axleroad.* And *Willits* was appropriately limited to its facts, the

court holding, in recognition of that 1968 alteration, only that the

Governor "is not immune merely by reason of his chief executive status from being coerced by mandamus to issue a *state warrant*." *Willits*, 279 So. 2d at 3 (emphasis supplied).

Framing the holding this way, we implicitly acknowledged the still-extant, overarching legal principle *Drew* announced in the 1800s—that the Governor, as supreme executive, is immune from mandamus regarding all his core executive functions and nearly all his ministerial duties—consistent with the specific exception included in Article IV, section 4.[2]  Seven years later, the court expanded ever so slightly on the set of ministerial duty exceptions, holding that the Governor could be subject to mandamus when the "ministerial duty lodged in the Governor could as easily have been imposed upon any other person."  *Republican State Exec. Comm. v. Graham*, 388 So. 2d 556, 557 n.1 (Fla. 1980) (noting that the duty

---

2.  Notably, in 1984, the voters rewrote section 4, removing in the process the reference to the Governor's having to countersign warrants, and along with it, the provision expressly subjecting him to mandamus for that ministerial duty.  *See* Fla. HJR 435 (1983) (proposed the amendment to Article IV, section 4 adopted by voters in 1984).

"is presently shared with the secretary of state").  It cited *Drew* and

*Willits* as authority, thereby reaffirming the continued viability of

the 1879 gubernatorial immunity principle with respect to the

Governor's executive powers, *despite* the 1950s constitutional

addition of mandamus authority over "state officers."  As late as

1980, we necessarily continued to consider the Governor to be

beyond the scope of the term "state officer," as it is used in Article

V.

B

The Governor obviously is not a "state officer" under the

Constitution.  Indeed, he is unlike any other officer in this State's

government.  The Florida Constitution vests "[t]he *supreme*

executive power" in the Governor alone.  Art. IV, § 1(a), Fla. Const.

(emphasis supplied).  The Constitution does not expressly vest

executive power in anyone else (save for the Florida Fish and

Wildlife Conservation Commission under very narrow

circumstances, as provided in Article IV, section 9).  He is the

commander-in-chief of this State's armed forces, and he has the

sole responsibility to "take care that the laws be faithfully executed" and "transact all necessary business with the officers of government." *Id.* He also has the responsibility to "commission *all officers* of the state and counties." *Id.* (emphasis supplied). Of particular relevance here, in nearly every instance, he has the authority to fill vacancies in elected and appointed "state [and] county office[s]," as well as "judicial office[s]" (but not "legislative office[s]"). *See* Art. IV, § 1(f), Fla. Const.; Art. V, § 11, Fla. Const.; *but cf.* Art. III, § 15(d), Fla. Const. These powers—especially the appointment power—are core executive functions that only the Governor can perform.

He also is the only constitutional officer expressly given the authority to "initiate judicial proceedings in the name of the state against any executive or administrative state, county or municipal officer to enforce compliance with any duty or restrain any unauthorized act." Art. IV, § 1(b), Fla. Const. Moreover, he has the authority to "suspend from office *any state officer* not subject to impeachment." *Id.* § 7(a) (emphasis supplied). And, as noted

above, the Constitution expressly gives only the Governor the authority to "request in writing the opinion of the justices of the supreme court as to the interpretation of any portion of this constitution upon any question affecting the governor's executive powers and duties." *Id.* § 1(c); *see also id.* (requiring that we issue that written opinion no earlier than ten days after receiving the request, unless we determine that an earlier response is necessary).

If this prerogative of the Governor to request from us an advisory opinion is one, as we have said, that sets the "boundary" beyond which we cannot go to "intermeddle" in his executive duties; and if it has existed in the Constitution in one form or another since the 1880s; then absent a clear constitutional change, there could be no logical justification for taking a different view now, right? Taking this prerogative together with his authority to initiate writ proceedings against any state, county, or local officer, one easily can see that what we said in the 1880s still applies today—that our involvement in the Governor's own executive functions can be only at his behest.

II

Yet, with nary a whisper of analysis, this court in 1982 suddenly and boldly—almost by fiat—claimed for itself the ability to subjugate the supreme executive to its own power.  *See Fla. Senate v. Graham*, 412 So. 2d 360 (Fla. 1982); *Jud. Nominating Comm'n v. Graham*, 424 So. 2d 10 (Fla. 1982).

In the *Florida Senate* decision, while at least still acknowledging there was a problem with issuing "an alternative writ of mandamus to the chief executive of this state" (as there had been for the preceding century), the court nevertheless tried to avoid the question by relying on, ostensibly, "an independent basis for jurisdiction in this case"—this court's so-called "all writs" authority. 412 So. 2d at 361.  The court, though, failed to specify what other writ it supposedly could issue to the Governor that was not mandamus, meaning it also simply ignored the fact that it was still, for the first time in the State's history, claiming the power to subordinate the Governor to its own authority regarding his performance of core executive functions.  Later that year, the court

dispensed with any jurisdictional analysis at all, merely citing Article V, section 3(b)(8) of the Florida Constitution as the authority to consider a petition for mandamus against the Governor regarding one of his core functions—though the court ultimately denied the requested writ. *See Jud. Nominating Comm'n*, 424 So. 2d at 10.

This court's effort to subjugate the Governor has continued in earnest, it not once in the ensuing decades acknowledging that it had effectively abrogated the age-old gubernatorial immunity principle or explaining what constitutional change justified that abrogation. *See Fla. House of Representatives v. Martinez*, 555 So. 2d 839, 846 (Fla. 1990) (in a mandamus proceeding, ordering "the Governor and Comptroller [to] take all actions necessary to ensure that [the secretary of state's mandated] expunctions are reflected in the financial operations of the state"); *Jones v. Chiles*, 638 So. 2d 48, 48 (Fla. 1994) (citing to Article V, section 3(b)(8) as authority to consider mandamus petition asking that the Governor be ordered to reappoint a compensation-claims judge, but denying the writ).

A decade later, this court jumped another guardrail in its ongoing effort to claim power over the Governor's performance of core executive functions when it actually ordered the Governor to make a judicial appointment, merely citing, with a sigh and shrug (and in a footnote, no less), to Article V, section 3(b)(8) as its sole authority. *Pleus v. Crist*, 14 So. 3d 941, 942 & n.3 (Fla. 2009) (in a mandamus proceeding, ordering the Governor to make a judicial appointment within a constitutionally established time period and simply citing Article V, section 3(b)(8) as authority).

It has been full speed ahead since then. *See, e.g., Pizzi v. Scott*, 160 So. 3d 897, 2014 WL 7277376, at *2 (Fla. 2014) (table) (ordering the Governor to revoke his own executive order suspending a municipal officer, but without citing any authority at all for doing so); *Thompson v. DeSantis*, No. SC20-985, 2020 WL 5362111, at *2 (Fla. Sep. 8, 2020) (ordering the Governor "to show cause why he should not be required immediately to fill the [supreme court] vacancy . . . by appointing a candidate who was on the JNC's certified list," citing *Pleus* as authority); *Thompson v.*

*DeSantis*, No. SC20-985, 2020 WL 5494603, at *2 (Fla. Sep. 11, 2020) (requiring the Governor to "fully comply with [the court's] order" within three days, citing *Pleus* as authority); *cf. Whiley v. Scott*, 79 So. 3d 702, 707 (Fla. 2011) (claiming authority to issue a quo warranto writ to the Governor under Article V, section 3(b)(8) because the "Governor is a state officer"); *Thompson v. DeSantis*, 301 So. 3d 180, 184 (Fla. 2020) (citing *Pleus* and *Whiley* as authority, from a standing perspective, to compel the Governor by writ to perform his constitutional duty).

Across all these decisions, the court essentially has ignored the position of restraint it took toward the supreme executive for more than a hundred years—a position rooted in the Florida Constitution's text as well as in well established legal history and tradition. More should be required before this court makes such a significant about-face on a fundamental separation-of-powers matter regarding the head of a branch who is co-equal in dignity with us.

III

As to this last point, let me close with two court observations about its own precedent that seem pertinent here.  First, we have made clear that the court "does not intentionally overrule itself sub silentio."  *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).  We instead "adhere[] to the doctrine of stare decisis," so if this court is going to recede from a prior line of decision, it will do so "expressly." *Dorsey v. State*, 868 So. 2d 1192, 1199 (Fla. 2003).  Second, "[i]t is no small matter for one Court to conclude that a predecessor Court has clearly erred," which means we need to show our work in reaching that conclusion, showing "a searching inquiry, conducted with minds open to the possibility of reasonable differences of opinion."  *State v. Poole*, 297 So. 3d 487, 506 (Fla. 2020).

This court's approach to claiming writ authority over the Governor in the mandamus context—by simply ignoring what it said before to the contrary—fails on both these fronts.  This court wrestled with the question in 1879 and explained in detail how it reached the conclusion it did in *Drew*.  We owe the public an

analytical response (rather than silence) before claiming a power over the Governor that we historically eschewed. In turn, the restraint and immunity principles to which this court had faithfully hewed for over a century in matters concerning the Governor carry the day for me. I would have dismissed the petition at the outset.

A True Copy
Test:

SC2026-0985  8/7/2026

John A. Tomasino
Clerk, Supreme Court

SC2026-0985  8/7/2026

SO

Served:

GENERAL COUNSEL, GOVERNOR
CAROLINE ANDREWS MCNAMARA
MICHELLE MORTON
ADAM JEFFREY RICHARDSON
DANIEL BOAZ TILLEY
NICHOLAS LYNDOL VILLACORTA WARREN